No. 25-410
_____
_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT
_____

BOATERS RIGHTS ASSOCIATION, an Oregon non-profit corporation; et al,

    Plaintiffs-Appellants,

        v.

CRAIG WITHEE, in his official capacity as a member of the Oregon State
Marine Board; et al,

    Defendants-Appellees,

        and

CLACKAMAS COUNTY SHERIFF'S OFFICE; et al,

    Defendants.
_____

APPELLEES' BRIEF
_____

Appeal from the United States District Court
for the District of Oregon
_____

DAN RAYFIELD  #064790
Attorney General
BENJAMIN GUTMAN  #160599
Solicitor General
CARSON L. WHITEHEAD  #105404
Assistant Attorney General
1162 Court St. NE
Salem, Oregon 97301-4096
Telephone:  (503) 378-4402
carson.l.whitehead@doj.oregon.gov
Attorneys for Appellees
_____
_____

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................1

STATEMENT OF JURISDICTION .....................................................2

STATEMENT OF ISSUES ...................................................................2

STATEMENT OF THE CASE ..............................................................3

SUMMARY OF ARGUMENT .............................................................7

STANDARDS OF REVIEW.................................................................8

ARGUMENT.........................................................................................9

    A.   Legal background...........................................................................9

        1.   Oregon law regulates towed watersports and wake surfing. ................................................................................ 9

            a.   The Oregon legislature created the towed watersports program in 2019 to regulate activities in the Newberg Pool..................................... 9

            b.   In 2022, the legislature amended the 2019 legislation to bar wake surfing and limit the weight of boats for towed watersports. .................... 11

        2.   The federal Sport Fish Restoration Act provides funding for states to increase access to water for recreational boating............................................................ 12

    B.   Plaintiffs have not shown any Congressional intent to protect towed watersports with boats greater than 5,500 pounds or wake surfing. ...............................................................14

    C.   Oregon law is consistent with the Sport Fish Recreation Act. ......19

    D.   Alternatively, *Buckley* does not control, and the Act does not create a right that is enforceable in a § 1983 action.......................24

CONCLUSION....................................................................................29

i

# TABLE OF AUTHORITIES

## Cases Cited

*Blessing v. Freestone*,
520 U.S. 329 (1997) .......................................................................... 26, 28

*Brunozzi v. Cable Commc'ns, Inc.*,
851 F.3d 990 (9th Cir. 2017) ................................................................... 22

*Buckley v. City of Redding, Cal.*,
66 F.3d 188 (9th Cir. 1995) .................. 5, 8, 19, 20, 21, 24, 25, 26, 27, 28

*Chae v. SLM Corp.*,
593 F.3d 936 (9th Cir. 2010) ................................................................... 18

*Gonzaga Univ. v. Doe*,
536 U.S. 273 (2002) .......................................................................... 25, 28

*Kissimmee River Valley Sportsman Ass'n v. City of Lakeland*,
250 F.3d 1324 (11th Cir. 2001) ................................................................ 28

*Sandoval v. County of San Diego*,
985 F.3d 657 (9th Cir. 2021) ..................................................................... 9

*Save Our Valley v. Sound Transit*,
335 F.3d 932 (9th Cir. 2003) ................................................................... 27

*State v. Gaines*,
346 Or. 160, 206 P.3d 1042 (2009) ......................................................... 22

*Whitman* v. *American Trucking Assns., Inc.,*
531 U.S. 457 (2001) ................................................................................ 18

*Wyeth v. Levine*,
555 U.S. 565 (2009) ................................................................................ 18

## Constitutional and Statutory Provisions

16 U.S.C § 777c .................................................................................... 13

16 U.S.C § 777g(b)(1) ..................................................................... 13, 14, 15

16 U.S.C. § 777(a) ........................................................................... 14, 15

16 U.S.C. § 777e .................................................................................... 13

16 U.S.C. § 777e(a) ............................................................................... 14

16 U.S.C. § 777g .................................................................... 3

16 U.S.C. § 777g(b) ............................................................ 16

16 U.S.C. § 777g(c) ............................................................ 14

16 U.S.C. § 777g(g) ............................................................ 16

16 U.S.C. §§ 777–777m .................................................... 3, 12

42 U.S.C. § 1983 ............................................... 2, 3, 5, 8, 19, 20, 24, 25, 26, 27

Or. Rev. Stat. § 496.510–525 ............................................ 5

Or. Rev. Stat. § 830.110(5) ............................................... 4

Or. Rev. Stat. § 830.640(1) ................................................ 9

Or. Rev. Stat. § 830.640(2) ................................................ 9

Or. Rev. Stat. § 830.640(2)(b) ......................................... 10

Or. Rev. Stat. § 830.640(2)(c) ......................................... 10

Or. Rev. Stat. § 830.640–655 ........................................... 4

Or. Rev. Stat. § 830.643(1)(a) ......................................... 10

Or. Rev. Stat. § 830.643(2)(a) .................................... 10, 11

Or. Rev. Stat. § 830.643(2)(b) .................................... 10, 11

Or. Rev. Stat. § 830.643–655 ............................................ 9

Or. Rev. Stat. § 830.649(1) ........................................... 9, 11

Or. Rev. Stat. § 830.649(2) ............................................. 10

Or. Rev. Stat. § 830.649(3) ............................................. 12

Or. Rev. Stat. § 830.649(c) ............................................. 22

U.S. Const., Amend. XI .................................................. 5, 6

## Administrative Rules

50 C.F.R. § 80.21 ........................................................ 13, 27

50 C.F.R. § 80.24 ............................................................. 27

50 C.F.R. § 80.3 ............................................................... 27

50 C.F.R. § 80.5(b) .......................................................... 27

50 C.F.R. § 80.51 ........................................................ 13, 28

50 C.F.R. § 80.51(b)(1)................................................................. 13, 15

*Former* 50 C.F.R. § 80.24.................................................................20

*Former* Or. Admin. Rule 250-018-0010(16) – (17) (2020) ...............................10

*Former* Or. Admin. Rule 250-018-0010(9) (2020) .............................................10

Or. Admin. Rule 250-018-0010(16) .......................................................9

## Other Authorities

Fed. R. Civ. P. 56(a) ...........................................................................8

Senate Bill 1589 (2022) ............... 1, 2, 3, 4, 5, 7, 8, 11, 19, 20, 21, 22, 23, 24, 26

Senate Bill 1589 § 1(2)(b) ...................................................................11

Senate Bill 1589 § 2(1)(a)...................................................................12

Senate Bill 1589 § 2(1)(b) ........................................................... 3, 9, 11

Senate Bill 1589 § 2(1)(c)............................................................ 3, 9, 11

Senate Bill 1589 § 2(5) .......................................................................12

Senate Bill 1589 § 6...........................................................................23

U.S. Fish & Wildlife Service, *Service Manual*, 517 FW 7 (Dec. 7, 2012) . 16, 21

iv

## APPELLEES' BRIEF
_____

## INTRODUCTION

In 2022, the Oregon Legislative Assembly passed Senate Bill 1589 ("SB 1589") to regulate recreational boating activities on a portion of the Willamette River known as the Newberg Pool Congested Zone ("Newberg Pool"). SB 1589 limits the maximum weight of boats that can be used for towed watersports—where an individual is towed forward by a vessel (e.g., water skiing and wakeboarding)—to less than 5,500 pounds and prohibits wake surfing—where an individual is propelled forward by the motorboat's wake—in the Newberg Pool.

Plaintiffs are two individuals who use the Newberg Pool for wake surfing and towed watersports, and a nonprofit organization that advocates for recreational boating. Plaintiffs argue that they have enforceable rights under federal law to engage in their preferred recreational activities in a motorboat of any weight in the Newberg Pool and that the restrictions imposed by SB 1589 violate those rights. Specifically, plaintiffs allege that boating facilities in the Newberg Pool are funded by the Federal Aid in Sport Fish Restoration Act ("Sport Fish Restoration Act" or "Act"), and that the Act confers an unfettered right to recreational boating—including the activities of wake surfing and using a boat that weighs more than 5,500 pounds for towed watersports.

Plaintiffs are wrong. Congress passed the Sport Fish Restoration Act decades ago to provide funding for states to restore fish habitat and increase recreational access to the nation's waters. To the extent that the Act creates an enforceable federal right to access the water at facilities funded by the Act, the Act does not limit a state's ability to regulate the specific activities that occur on the water, including Oregon's prohibition on wake surfing and the limitation on the weight of boats that can engage in towed watersports in the Newberg Pool. Nothing in the Act suggests that Congress intended to override a state's traditional police power to regulate boating activities when a state accepts funding under the Act. Because the Act does not protect the recreational activities that are regulated by SB 1589, the district court correctly dismissed plaintiffs claim on the parties' cross-motions for summary judgment.

## STATEMENT OF JURISDICTION

Defendants-appellees accept plaintiffs-appellants' statement of jurisdiction.

## STATEMENT OF ISSUES

1.      Does the Sport Fish Recreation Act prohibit the Oregon legislature from regulating wake surfing and towed watersports in the Newberg Pool?

2.      Alternatively, does the Sport Fish Recreation Act create an enforceable right that plaintiffs can pursue in a § 1983 action?

3

## STATEMENT OF THE CASE

At issue in this case is whether federal law—the Sport Fish Restoration Act, 16 U.S.C. §§ 777–777m—prohibits the Oregon legislature from regulating wake surfing and towed watersports in the Newberg Pool, which is a portion of the Willamette River beginning at Willamette Falls and ending at the mouth of the Yamhill River.

As relevant here, the Act provides federal grants to states to develop and maintain recreational boating facilities. 16 U.S.C. § 777g. The Oregon Department of Fish and Wildlife receives funding under the Act, some of which is distributed to the Oregon Marine Board. ER-10. Funds received under the Act have been used for facilities that provide access to the Newberg Pool. ER-10.

In 2022, the legislature adopted SB 1589,[1] which prohibits wake surfing in the Newberg Pool and limits the weight of boats that can be used for towed watersports—like wakeboarding and waterskiing—to those that weigh less than 5,500 pounds. SB 1589 § 2(1)(b) and (c). Plaintiffs subsequently brought this action under 42 U.S.C. § 1983, alleging that SB 1589 violates their federal rights under the Act.

---

[1] The full text of SB 1589 is included in the appendix to plaintiffs-appellants' opening brief at page A-2.

4

Plaintiff Boaters Rights Association ("the Association") is an Oregon nonprofit organization that advocates for recreational boaters, including boaters who wake surf and engage in towed watersports in Newberg Pool. ER-125. The Association is comprised of recreational boaters and recreational boating business owners and alleges that its members are adversely affected by SB 1589. ER-130. Plaintiffs Scott and Shaloe Putnam are individuals who desire to engage in wake surfing and towed watersports in the Newberg Pool, using a motorboat that exceeds 5,500 pounds. They also own a home on the Willamette River. ER-126; ER-130–131.

The named official-capacity defendants in this action are the five members of the Oregon Marine Board. ER-126–27. The Marine Board is charged with administering SB 1589 and regulating towed watersports and wake surfing. *See* Or. Rev. Stat. § 830.640–655. The Marine Board also generally has the power and duty to "[a]dvise and assist county sheriffs and other peace officers in the enforcement of laws relating to boating." Or. Rev. Stat. § 830.110(5).[2] The complaint also named Curt Melcher, Director of the Oregon Department of Fish and Wildlife ("ODFW") as a defendant. ER-126.

---

[2] Plaintiffs also named the Clackamas County Sheriff's Office, and the Yamhill County Sheriff's Office were as defendants, but the district court dismissed those defendants without prejudice. ECF No. 22.

5

ODFW distributes the funds received by the state under the Sport Fish Restoration Act. *See* Or. Rev. Stat. § 496.510–525.

In their complaint, plaintiffs raised one claim for declaratory judgment. ER-132. Plaintiffs alleged that the Act creates rights for recreational boaters to access and recreate in waters using facilities that were built with funds under the Act. ER-132. They seek a declaration that SB 1589 is invalid because it restricts their federal rights, as protected by the Act, and injunctive relief to permanently enjoin the enforcement of SB 1589. ER-133.

Defendants moved to dismiss the complaint, asserting that the complaint failed to state a claim for relief because the Act did not create an enforceable right for plaintiffs to wake surf or engage in towed watersports with boats exceeding 5,550 pounds, and, in any event, SB 1589 was consistent with the Act. ER-109–10. Defendants also asserted that the claim against ODFW Director Melcher was barred by Eleventh Amendment immunity. ER-109. The district court denied the motion to dismiss for failure to state a claim. ER-104. First, the court relied on *Buckley v. City of Redding, Cal.*, 66 F.3d 188, 192 (9th Cir. 1995) to conclude that "the Act confers recreational boaters with the enforceable right under § 1983 to access the Newberg Pool for specified recreational purposes." ER-103. Second, the court concluded that plaintiffs had plausibly alleged that SB 1589 violated that right. As to the Eleventh

6

Amendment argument, the district court granted defendants' motion to dismiss Director Melcher with prejudice because he was immune from suit.[3] ER-106.

Subsequently, plaintiffs moved for summary judgment, asserting that they were entitled to their requested declaration and injunction as a matter of law and that there were no disputes of material fact. ER-84–85. Defendants cross-moved from summary judgment, asserting that plaintiffs lacked standing and that their claim failed as a matter of law, reiterating and expanding the arguments from the motion to dismiss. ER-44.

In its opinion and order, the district court explained that "[f]unding apportioned under the Act was used for the construction and maintenance of facilities along the Newberg Pool." ER-10. The order notes that ODFW receives approximately $8 million in funding under the Act, some of which is distributed to the Marine Board and ultimately used for the construction and improvement of boating facilities. ER-10–11.

The district court then denied plaintiffs' motion for summary judgment and granted defendants' cross-motion. First, the district court concluded that plaintiffs had standing. ER-20–21. Second, the court adhered to its prior ruling that the Act creates enforceable right to access the Newberg Pool from facilities

---

[3]     Plaintiffs do not appeal the ruling on Eleventh Amendment immunity.

funded by the Act.  ER-14.  Third, the district court concluded that SB 1589 did

not violate plaintiffs' right to access the Newberg Pool, agreeing with

defendants that the Act does not prohibit the state from restricting wake surfing

and towed watersports in boats weighing 5,500 pounds or more.  ER-22.

## SUMMARY OF ARGUMENT

This court should affirm the district court's judgment.  The Sport Fish

Recreation Act provides funding to the states to improve access to water for

recreational boating.  The Act, however, does not purport to limit the traditional

police power of the state to regulate activities that occur on the water.  The

plain text of the Act says nothing about a state's ability to restrict or prohibit

recreational activities.  And nothing in the Act supports plaintiffs' efforts to

infer a limitation on state lawmaking authority from the Act's general purpose

of providing funding to benefit recreational boating.  Nor have plaintiffs shown

any congressional intent to protect the specific activities of wake surfing and

towed watersports.

By adopting SB 1589, the Oregon legislature acted to protect public

safety, aquatic resources, and personal property from the harms that follow

from wake surfing and towed watersports with heavy boats in the Newberg

Pool.  Doing so was entirely consistent with the Act.  Moreover, SB 1589 does

not prohibit any person from accessing the Newberg Pool.  Because plaintiffs

have not shown any intent by Congress to limit states from passing laws like SB 1589 and because SB 1589 is consistent with the Act, the district court properly entered judgment for defendants.

Alternatively, this court should affirm the district court's judgment because the Act does not create a right that plaintiffs can enforce in a § 1983 action. The district court relied on this court's decision in *Buckley v. City of Redding, Cal.*, 66 F.3d 188 (9th Cir. 1995), to conclude that the Act creates an enforceable right to access the water for recreational boating. *Buckley*, however, was decided before the United States Supreme Court clarified the test for when a federal law creates an enforceable right under § 1983. The Supreme Court's cases cast doubt on continued validity of *Buckley*. Additionally, *Buckley* relied on federal regulations that have been repealed to interpret the Act and to conclude that it created an enforceable right. And *Buckley* addressed a different type of local law, one that prohibited an entire class of boats from accessing the water. Because *Buckley* does not control, this court can affirm the district court's judgment on the alternative basis that plaintiffs do not have an enforceable right under § 1983.

## STANDARDS OF REVIEW

Under Fed. R. Civ. P. 56(a), a court may grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." This court reviews a district court's decision to grant summary judgment *de novo*. *Sandoval v. County of San Diego*, 985 F.3d 657, 665 (9th Cir. 2021).

## ARGUMENT

### A. Legal background

#### 1. Oregon law regulates towed watersports and wake surfing.

"Towed watersports" and "wake surfing" are terms of art defined by state law. "Towed watersports" are "activities that involve being towed by a vessel." Or. Admin. Rule 250-018-0010(16). "Wake surfing," on the other hand, is "the activity of propelling an individual forward on equipment similar to a surfboard, using a boat's wake" regardless of whether the person is "holding a rope or free riding." SB 1589 § 2(1)(b) and (c) (amending Or. Rev. Stat. § 830.649(1)).

##### a. The Oregon legislature created the towed watersports program in 2019 to regulate activities in the Newberg Pool.

In 2019, the Oregon legislature created "within the State Marine Board a towed watersports program" to, among other things, develop and promote towed watersports safety and address operator responsibilities for accident and property damage prevention. Or. Rev. Stat. § 830.640(1) and (2); *see also* Or. Rev. Stat. § 830.643–655. The 2019 statutes designated a portion of the Willamette River as the Newberg Pool, and required that, within the Newberg

Pool, people that engage in wake surfing or wakeboarding, as defined by the Marine Board, must carry a "towed watersports endorsement" and that the boat must display a "watersports motorboat certificate decal." Or. Rev. Stat. § 830.649(2).

The towed watersports program statutes authorized the Marine Board to issue and renew towed watersports endorsements and towed watersports motorboat certificates. Or. Rev. Stat. § 830.640(2)(b) and (c). The statutes specified that a person may obtain a towed watersports endorsement if, among other things, the person holds a certificate demonstrating an understanding of minimum standards for boating safety. Or. Rev. Stat. § 830.643(1)(a). The 2019 statutes further provided that a person may obtain a towed watersports motorboat certificate decal to be affixed to a registered motorboat if, among other things, the person has a towed watersports endorsement and the motorboat loading weight meets the requirements for maximum loading weight established by the Marine Board by rule. Or. Rev. Stat. § 830.643(2)(a) and (b). Based on the 2019 legislation, the Marine Board promulgated rules that set a maximum loading weight of 10,000 pounds for a towed watersports motorboat certificate, *former* Or. Admin. Rule 250-018-0010(9) (2020), and provided that wake surfing was within the scope of activities allowed under the towed watersports program, *former* Or. Admin. Rule 250-018-0010(16) – (17) (2020); *see also* Or.

Rev. Stat. § 830.643(2)(a) and (b) (providing Marine Board with rulemaking authority).

####      b.    In 2022, the legislature amended the 2019 legislation to bar wake surfing and limit the weight of boats for towed watersports.

In 2022, the legislature again addressed towed watersports and wake surfing in the Newberg pool by adopting SB 1589, which amended the towed watersports program statutes. First, the legislature redefined the term "towed watersports" to exclude "wake surfing." SB 1589 defined "wake surfing" as "the activity of propelling an individual forward on equipment similar to a surfboard, using a boat's wake" and specified that "[t]he person may be holding a rope or free riding." SB 1589 § 2(1)(b) and (c) (amending Or. Rev. Stat. § 830.649(1)).

Second, SB 1589 lowered the maximum loading weight[4] of a motorboat from 10,000 pounds to less than 5,500 pounds for a person to obtain a towed watersports motorboat certificate decal. SB 1589 § 1(2)(b) (amending Or. Rev. Stat. § 830.643(2)(b)). Because "[t]he owner of a motorboat shall display a towed watersports motorboat certificate decal if the motorboat is engaged in

---

[4]      The maximum loading weight of a motorboat is the sum of the factory-specified dry gross weight and the factory-specified maximum factory ballast capacity. *See* SB 1589 § 1(2)(b).

12

towed watersports within the Newberg Pool Congested Zone," Or. Rev. Stat. §
830.649(3), motorboats with a maximum loading weight of 5,500 pounds or
greater cannot be used for towed watersports in the Newberg Pool.

Third, the legislature included a new provision that prohibits wake
surfing and the use of devices or individuals to increase wakes in the Newberg
Pool. SB 1589 § 2(5). Fourth, the legislature expanded the Newberg Pool to
start at Willamette Falls (river mile 26.6) and end at the mouth of the Yamhill
River (river mile 55). SB 1589 § 2(1)(a).

### 2. The federal Sport Fish Restoration Act provides funding for states to increase access to water for recreational boating.

The Sport Fish Restoration Act provides federal grants to states for fish
restoration and management projects and for boating access, among other
things. 16 U.S.C. §§ 777–777m. Pursuant to the Act, revenue is collected from
several sources—including taxes on electric motors, fishing equipment, and
motorboat and small engine fuels—and deposited into the Sport Fish
Restoration & Boating Trust Fund. *See* SER-8–10 (diagram from U.S. Fish &
Wildlife Service showing sources of revenue for Sport Fish Restoration &
Boating Trust Fund). Grants from the fund for boating access are administered
through the Sport Fish Restoration Recreational Boating Access subprogram.
The Act requires that each state allocate 15 percent of apportioned funds to pay
"the costs of the acquisition, development, renovation, or improvement of

facilities * * * that create, or add to, public access to the waters of the United States to improve the suitability of such waters for recreational boating purposes." 16 U.S.C § 777g(b)(1). Federal officials are charged with authority to apportion funds, review and approve plans and projects and, if a state fails to comply with required conditions, determine that the state is ineligible to receive funds. *See* 16 U.S.C § 777c (assigning apportionment authority to the Secretary of the Interior); 16 U.S.C. § 777e (requiring the Secretary of Interior to approve plans and projects); 50 C.F.R. § 80.21 (Director of U.S. Fish & Wildlife Service may declare a state ineligible to receive funds under the Act).

The U.S. Fish & Wildlife Service implements the Act and has adopted regulations explaining what activities are eligible for funding. *See* 50 C.F.R. § 80.51. Funding provided under the Act may be spent to "[a]cquire land for new facilities, build new facilities, or acquire, renovate, or improve existing facilities to create or improve public access to the waters of the United States or improve the suitability of these waters for recreational boating. A broad range of access facilities and associated amenities can qualify for funding, but they must provide benefits to recreational boaters." 50 C.F.R. § 80.51(b)(1).

As noted above, funds distributed under the Act were used for facilities that provide access to the Newberg Pool.

14

**B.     Plaintiffs have not shown any Congressional intent to protect towed watersports with boats greater than 5,500 pounds or wake surfing.**

As reflected by its plain terms, the Sport Fish Recreation Act creates a funding mechanism for states to improve recreational fishing and boating on the nation's waterways.  *See*, *e.g.*, 16 U.S.C. § 777(a) (requiring states to adopt laws for the conservation of fish before expending funds); 16 U.S.C. § 777e(a) (requiring state fish and game department to submit "programs or projects for fish restoration" as a condition of receiving funds); 16 U.S.C. § 777g(c) (permitting states to use up to 15 percent of the funds for "an aquatic resource education and outreach and communications program for the purpose of increasing public understanding of the Nation's water resources and associated aquatic life forms").

As relevant to this appeal, the Act provides that a state "shall allocate 15 percent of the funds apportioned to it" to pay for "the costs of the acquisition, development, renovation, or improvement of facilities (and auxiliary facilities necessary to insure the safe use of such facilities) that create, or add to, public access to the waters of the United States to improve the suitability of such waters for recreational boating purposes."  16 U.S.C § 777g(b)(1).  By its plain terms, that provision sets out the purposes for which a state must use a portion of the funding it receives under the Act: building, improving, or maintaining facilities that create or increase public access to waters for recreational boating.

As stated in the implementing regulations, "[a] broad range of access facilities and associated amenities can qualify for funding, but they must provide benefits to recreational boaters." 50 C.F.R. § 80.51(b)(1).

The Act, however, does not place any direct limitations on a state's ability to regulate activities that occur on the water. Plainly, Congress knows how to condition the receipt of federal funds on action by the state legislatures; it did just that in 16 U.S.C. § 777(a) by requiring states to adopt laws for the conservation of fish before they could receive funds under the Act. If Congress had intended for 16 U.S.C § 777g(b)(1) to require states to allow all types of recreational boating activities as a condition of receiving federal funds, the text of the law would indicate as much. But the Act contains no such limitation. At most, the Act requires the use of funds to benefit recreational boaters, and so a state could not use the funds in a way that did not have that effect. But a requirement for states to benefit recreational boaters by the use of funds granted by the Act is a far cry from a prohibition on state laws that regulate the types of activities and equipment that can be used on the water. There is simply no support in the Act for the latter proposition.

Notably, the U.S. Fish & Wildlife Service, which administers the Act, has issued guidance on how states can use grant funds. That guidance explains that states can restrict recreational boating activities and can regulate the

characteristics of boats using the facilities funded by the Act. U.S. Fish & Wildlife Service, *Service Manual*, 517 FW 7 (Dec. 7, 2012) (included at SER-65–70). The guidance provides that funded facilities "must be available to all recreational boaters, but States may restrict uses for public safety, property protection, noise abatement, or aquatic resource protection. Examples of restrictions include limiting the horsepower or types of boat motors and setting speed limits, no-wake zones, or hours of use." 517 FW 7.12C (included at SER-68). That guidance is consistent with the Act's plain text.

Nevertheless, plaintiffs contend that Congress intended to protect "*all* recreational boating" when it adopted the Sport Fish Restoration Act, and, because wake surfing and towed watersports with boats exceeding 5,500 pounds are forms of "recreational boating," Oregon law violates their rights. App. Br. 15 (emphasis in original). Despite that contention, plaintiffs identify no statutory language that requires the state to allow "all recreational boating" as a condition of accepting grant funds. Plaintiffs cite 16 U.S.C. § 777g(b), but, as discussed above, that provision does not impose any limitation on a state's ability to pass laws that regulate recreational boating.

Plaintiffs also cite 16 U.S.C. § 777g(g), which relates to surveys and requires the Secretary to "adopt a national framework for a public boat access needs assessment which may be used by States to conduct surveys to determine

the adequacy, number, location, and quality of facilities providing access to recreational waters for all sizes of recreational boats" and requires each state to develop a plan that ensures that there is "boat access adequate to meet the needs of recreational boaters on its waters." App. Br. 19. Those provisions, however, say nothing about any right to engage in specific recreational activities, like wake surfing or towed watersports. Rather, consistent with the other provisions of the Act, they reflect the general requirement that states use grant funds to improve access to water for recreational boaters.

Plaintiffs also assert that there "is simply no indication that Congress intended to limit the recreational boating benefited by the Act." App. Br. 19. But that is not the issue presented by this case. The issue here is whether Congress intended to *prohibit a state* from regulating the ways that boats can be used on the water. Under the Act, a state that receives funds must use those funds in a manner that is consistent with the Act's purpose of facilitating access of boats to public waters for recreational purposes. Although the Act certainly shows a general intent that states use the funding to benefit recreational boating and fishing, nothing in Act suggests that the general intent to benefit boating should be read to limit the state's regulatory authority over its waterways, much less to protect the specific activities of wake surfing and towed watersports.

18

The logical extension of plaintiffs' argument is that the Act provides them with a right to engage in any recreational boating activity in a boat of any size and weight, regardless of the impact on the environment, safety, and other recreational boaters. If Congress had intended for the Act to protect "all recreational boating" such that the states who receive funds would lose the ability to regulate that activity—including regulations that fall within the states' traditional police power—Congress would have stated that intent directly.[5] As this court has stated in the context of federal preemption, "the Supreme Court has told us to start with the assumption that a state's historic police powers will not be superseded absent a 'clear and manifest purpose of Congress.'" *Chae v. SLM Corp.*, 593 F.3d 936, 944 (9th Cir. 2010) (quoting *Wyeth v. Levine*, 555 U.S. 565 (2009)) (noting that courts "must be cautious * * * where a federal statute is urged to conflict with state law regulations within the traditional scope of the state's police powers"); *see also*, *Whitman* v. *American Trucking Assns., Inc.,* 531 U.S. 457, 468 (2001) ("Congress * * * does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes."). Although this case arises

---

[5]     Indeed, if plaintiffs were correct that Congress broadly intended to protect "all recreational boating" from state regulation, then it is unlikely that the states would be able to impose any basic protections for public safety and the environment, like speed limits and no-wake zones.

out of a § 1983 claim, the core question is the same as in a preemption case: Did Congress intend to remove the state's ability to regulate? Here, the Act does not show any intent to do so.

Because Congress did not intend to prohibit a state that receives funds under the Act from regulating recreational boating, plaintiffs' claim fails, and the district court correctly entered judgment for defendants.

## C.      Oregon law is consistent with the Sport Fish Recreation Act.

As discussed above, the Sport Fish Recreation Act does not prohibit a state that receives funds under the Act from regulating recreational boating and so plaintiffs' claim fails. Plaintiffs' claim also fails because, to the extent that the Act confers a right that is enforceable in a § 1983 action, that right relates to accessing the water for recreational boating and SB 1589 does not limit plaintiffs from accessing the Newberg Pool.

Relying on *Buckley*, the district court explained that the Act conferred the right "to access certain waterways for specified recreational purposes." ER-21 (quoting *Buckley*, 66 F.3d at 189). In *Buckley*, the specific recreational purpose alleged by the plaintiff was using a jet ski, a type of personal watercraft, which the City of Redding had prohibited in a stretch of the Sacramento River. *Buckley*, 66 F.3d at 189–90. Based on now-repealed regulations from the U.S. Fish & Wildlife Service that required recipients of

federal funds to accommodate "power boats with common horsepower ratings," *Buckley* explained that "a state may place horsepower limitations on boats using these facilities and surrounding waters.  But, if the power boat is within the permissible horsepower range, the state must not discriminate among those power boats with common horsepower ratings."  *Id*. at 192 (discussing *former* 50 C.F.R. § 80.24).  Next, *Buckley* concluded that the Act created an enforceable right under § 1983, relying again on the regulation's prohibition on discrimination between boats of common horsepower ratings.  *Id*. at 192.

The district court correctly concluded SB 1589 is not like the city ordinance in *Buckley*.  There, the plaintiffs had plausibly alleged that the ordinance discriminated between boats of common horsepower ratings by prohibiting all jet skis from operating in the Sacramento River.  In so doing, the city had prevented plaintiffs from accessing the river with a class of boats that were protected under the Act, owing to the then-existing regulations.

Here, by contrast, SB 1589 is fully consistent with the Act, with the implementing regulations, and with the policy guidance from the U.S. Fish & Wildlife Service.  As discussed above, the federal law and regulations require that funds provided by the Act benefit recreational boaters by facilitating access to the water.  But in contrast to the repealed regulation and city ordinance discussed in *Buckley*, the current regulations do not contain any requirements

related to the specific activities regulated by SB 1589. At the same time, the

policy guidance from the U.S. Fish & Wildlife Service directly explains that

states must make facilities available for all recreational boaters but that states

remain free to regulate how the boats operate, for example, by establishing

speed limits and no-wake zones. 517 FW 7.12C.

SB 1589 does not prohibit any person from accessing the water with any

boat. Instead, it restricts the activities that a person may engage in after

accessing the water by prohibiting wake surfing and by limiting the boats that

can engage in towed watersports to those that weigh less than 5,500 pounds.

Nor is SB 1589 tantamount to a restriction on access from a federally funded

facility. *See Buckley*, 66 F.3d at 193 (rejecting the city's argument that the ban

on using jet skis in the river was not a restriction on access from the federally

funded boat launch). Again, SB 1589 does not bar plaintiffs or anyone else

from using any boat in the Newberg Pool or from accessing that stretch of the

Willamette River. Rather, SB 1589 regulates the specific activities of wake

surfing and towed watersports.

In arguing that SB 1589 violates their rights under the Act, plaintiffs

assert that the law does not protect public safety or the environment, and so the

law is not the kind of restriction envisioned by the U.S. Fish & Wildlife Service

guidance. App. Br. 25. Plaintiffs also assert that this court owes no deference

to the guidance in the first place, suggesting that this court should disregard it. App. Br. 25–26.  To be sure, the policy guidance is not binding on this court. But it is persuasive authority that squarely supports defendants' position that states remain free to enact laws that regulate how individuals use their boats on the water.

Plaintiffs are also incorrect that SB 1589 does not serve the purpose of protecting public safety and aquatic resources.  The text, context, and legislative history all show that the legislature intended for SB 1589 to protect other users of the Newberg Pool, the river itself, and personal property from the harms caused by the large wakes that are required for wake surfing and that occur when a person uses a large and heavy boat for towed watersports.  *See State v. Gaines*, 346 Or. 160, 171–72, 206 P.3d 1042 (2009) (Oregon courts determine legislative intent by examining the text and context of the statutory provisions, and, as needed, the pertinent legislative history.); *Brunozzi v. Cable Commc'ns, Inc.*, 851 F.3d 990, 998 (9th Cir. 2017) ("[W]e must follow the state's rules of statutory interpretation.") (citation omitted).

Beginning with the text and context, there is an clear relationship between public safety and restrictions on wake surfing and towed watersports. Wake surfing involves "propelling an individual forward on equipment similar to a surfboard, using a boat's wake."  Or. Rev. Stat. § 830.649(c).  Of necessity,

that activity requires a boat to create a substantial wake, which poses an

obvious risk to other river users.  The same is true for towed watersports.  Any

activity that involves towing a person behind a boat raises safety issues for the

person being towed and for others on the river, who must navigate the around

the boat and the person being pulled behind it.  And when the boat being used is

heavy, the potential for the boat to create large wakes increases. Additionally,

the restrictions in SB 1589 apply only to the "Newberg Pool *Congested Zone*,"

which shows that the legislature's assessment that the regulations were needed

in that specific location that has extensive recreational use.  Lastly, the

legislature included an emergency clause in SB 1589 plainly stating that "[t]his

2022 Act being *necessary for the immediate preservation of the public peace,*

*health and safety*, an emergency is declared to exist, and this this Act takes

effect on its passage."  SB 1589 § 6 (emphasis added).

The legislative history reflects those safety concerns, as well as concerns

over damage to the aquatic environment and personal property caused by large

wakes.[6]  For example, in testimony before the Senate Committee on Energy and

Environment, Senator Bill Kennemer, the chief sponsor of the bill, explained

---

[6]     Defendants submitted extensive legislative history in support of
their motion for summary judgment and have included a portion of those
materials in the supplemental excerpt of record.  SER-13–62.

that SB 1589 "does not ban any boat on the Newberg Pool," but instead prohibits specific activities that "endanger other river users, boaters, swimmers, * * * paddle boarders, fishers, and others," and "damage property, create erosion, and cause muddy turbulence further threatening endangered salmon and aquatic life." SER-23–24. Senator Kennemer also explained that SB 1589 is necessary to preserve the Willamette River Greenway, protect shoreline property, protect fish, keep boating and river recreation safe, and "ensure[] boating is sustainable now and for future generations." SER-52; *see also* SER-22–27.

In short, the legislature intended for the prohibition on wake surfing and the limitation on boat weight for towed watersports in SB 1589 to protect public safety and aquatic resources. Those restrictions imposed by the bill are similar to speed limits and no-wake zones, which restrict boating activities on the water but do not restrict access to the water. Because SB 1589 is fully consistent with the Sport Fish Restoration Act, plaintiffs challenge to the law fails.

### D. Alternatively, *Buckley* does not control, and the Act does not create a right that is enforceable in a § 1983 action.

For all the reasons discussed above, the district court correctly granted summary judgment for defendants and correctly denied plaintiffs' motion. As noted, the district court, relying on *Buckley*, concluded that the Sport Fish Restoration Act created a federal right that plaintiffs could enforce in a § 1983

action. Although this court need not revisit *Buckley* for defendants to prevail, if it does so, this court should conclude that *Buckley* does not control and that the Act does not create a right that is enforceable in this § 1983 action.

There are several reasons for this court to view *Buckley* with skepticism. First, *Buckley* predates key U.S. Supreme Court authority that clarifies the type of specific statutory language that is required to show Congressional intent to create a right that is enforceable under § 1983. As the Court has explained, nothing "short of an unambiguously conferred right [can] support a cause of action brought under § 1983." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002). The question of whether Congress intended to create an enforceable right under § 1983 is "definitively answered in the negative where a statute by its terms grants no private rights to any identifiable class." *Id.* at 283–84 (internal citation and quotation marks omitted). In *Gonzaga*, the Supreme Court addressed "confusion" in the lower courts by expressly rejecting the proposition that a plaintiff can "enforce a statute under § 1983 so long as the plaintiff falls within the general zone of interest that the statute is intended to protect." 536 U.S. at 283. Instead, the Court in *Gonzaga* held that some "rights-creating" language that reflects an "individual entitlement" or "concern[] with whether the needs of any particular person have been satisfied" is required for Congress to create an individual right enforceable under § 1983. *Id.* at 287–88. The Sport Fish

Restoration Act lacks any such "rights-creating" language. The Ninth Circuit decided *Buckley* without the benefit of this important clarification from the Supreme Court, and its holding must be interpreted within the context of this later authority.

*Buckley* also predates the Supreme Court's decision in *Blessing v. Freestone*, where the Court explained that any right purportedly enforceable under § 1983 must be identified with particularity in the federal statute and "analyzed * * * in very specific terms." 520 U.S. 329, 343 (1997); *see also id.* at 342–44 (Courts cannot "paint[] with too broad a brush" or take a "blanket approach" in determining whether a federal statute creates enforceable rights).

Thus, under *Gonzaga* and *Blessing*, it is insufficient for plaintiffs to allege, in general terms, that the "Act confers enforceable rights to recreational boating." (ER-124 (citing *Buckley*)). Instead, plaintiffs must show that the Act confers the specific right that they seek—the right to engage in their preferred activities of wake surfing and towed watersports using a boat of their preferred weight in the Newberg Pool. Plaintiffs point to no provision of the Act that confers this specific right, and *Buckley* is inapposite because it addressed a different question. While the city ordinance at issue in *Buckley* banned power boats with common horsepower from the river altogether, SB 1589 merely restricts certain activities and does not discriminate against motorboats of equal

horsepower. Plaintiffs are free to recreate with boats in the Newberg Pool, so long as they do not engage in wake surfing or in towed watersports with a boat exceeding 5,500 pounds. As such, this court's holding in *Buckley*, which is based on a different ordinance and a different alleged right than plaintiffs seek to enforce, does not control.

Second, *Buckley* relied heavily on the Act's implementing regulations to determine that plaintiffs had an enforceable right to use a motorboat of equal horsepower at facilities funded by the Act. The Ninth Circuit has since clarified, however, that "plaintiffs suing under § 1983 must demonstrate that a *statute*—not a regulation—confers an individual right." *Save Our Valley v. Sound Transit*, 335 F.3d 932, 943 (9th Cir. 2003). Although an agency "regulation may be relevant in determining the scope of the right conferred by Congress * * * the inquiry must focus squarely on Congress's intent." *Id.* Close review of *Buckley* reveals that this court found an enforceable right largely based on agency regulations, and not on the text of the Act itself. *See Buckley*, 66 F.3d at 192 (citing 50 C.F.R. §§ 80.5(b), 80.24, 80.3 and 80.21).[7]

---

[7]    The Eleventh Circuit Court of Appeals expressly rejected *Buckley's* holding that the Act creates a federal right of equal access for boats with common horsepower reasoning that "[a]lthough the Act may well contemplate improvement of access generally for recreational boating, it does not create an equal access right. The part of the regulation [50 C.F.R. § 80.24], which Plaintiff contends does so, is too far removed from Congressional intent

*Footnote continued...*

Third, as discussed above, the regulation relied on in *Buckley* has since been repealed. The current regulation, 50 C.F.R. § 80.51, contains no prohibition on discrimination among power boats with common horsepower ratings and instead provides only that "[a] broad range of access facilities and associated amenities can qualify for funding, but they must provide benefits to recreational boaters." Accordingly, *Buckley* has little bearing on this case because of its heavy reliance on federal regulations—including the since-repealed regulation that prohibited discrimination among power boats with common horsepower ratings—and lack of analysis of the Act itself.

In sum, *Buckley* is readily distinguishable from this case, and *Buckley*'s reasoning has been undermined by *Gonzaga* and *Blessing*. If it reaches the issue, this court can affirm on the alternative basis that plaintiffs' have no enforceable right under the Act to wake surf and engage in towed watersports in a boat that exceeds 5,500 pounds in the Newberg Pool.

/ / /

/ / /

---

to create this enforceable right itself." *Kissimmee River Valley Sportsman Ass'n v. City of Lakeland*, 250 F.3d 1324, 1327 (11th Cir. 2001) ("Nothing in the statute suggests a right based on equality or comparability.").

## CONCLUSION

This court should affirm the district court's judgment.

Respectfully submitted,

DAN RAYFIELD  #064790
Attorney General
BENJAMIN GUTMAN  #160599
Solicitor General

/s/  Carson L. Whitehead

CARSON L. WHITEHEAD  #105404
Assistant Attorney General
carson.l.whitehead@doj.oregon.gov

Attorneys for Defendants-Appellees
Withee, Guzman, Jackson, Lambert
and Messett

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7), Federal Rules of Appellate Procedure, I certify

that the Appellees' Brief is proportionately spaced, has a typeface of 14 points

or more and contains 6,491 words.

DATED:  June 4, 2025

/s/  Carson L. Whitehead
_____
CARSON L. WHITEHEAD  #105404
Assistant Attorney General
carson.l.whitehead@doj.oregon.gov

Attorney for Defendants-Appellees
Withee, Guzman, Jackson, Lambert
and Messett

DAN RAYFIELD  #064790
Attorney General
BENJAMIN GUTMAN  #160599
Solicitor General
CARSON L. WHITEHEAD  #105404
Assistant Attorney General
1162 Court St.
Salem, Oregon 97301
Telephone: (503) 378-4402

Counsel for Appellees

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| BOATERS RIGHTS ASSOCIATION, an Oregon non-profit corporation; et al, | |
| Plaintiffs-Appellants, | U.S.C.A. No. 25-410 |
| v. | |
| CRAIG WITHEE, in his official capacity as a member of the Oregon State Marine Board; et al, | STATEMENT OF RELATED CASES |
| Defendants-Appellees, | |
| and | |
| CLACKAMAS COUNTY SHERIFF'S OFFICE, et al, | |
| Defendants. | |

Pursuant to Rule 28-2.6, Circuit Rules of the United States Court of

Appeals for the Ninth Circuit, the undersigned, counsel of record for Appellees,

/ / /

/ / /

certifies that he has no knowledge of any related cases pending in this court.

Respectfully submitted,

DAN RAYFIELD  #064790
Attorney General
BENJAMIN GUTMAN  #160599
Solicitor General

/s/  Carson L. Whitehead

CARSON L. WHITEHEAD  #105404
Assistant Attorney General
carson.l.whitehead@doj.oregon.gov

Attorneys for Defendants-Appellees
Withee, Guzman, Jackson, Lambert
and Messett

# CERTIFICATE OF SERVICE

I hereby certify that on June 4, 2025, I directed the Appellees' Brief to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Carson L. Whitehead

CARSON L. WHITEHEAD  #105404
Assistant Attorney General
carson.l.whitehead@doj.oregon.gov

Attorney for Defendants-Appellees
Withee, Guzman, Jackson, Lambert
and Messett